[Cite as *In re G.Eu.S.*, 2019-Ohio-5376.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

IN RE:                                                    CASE NO. 9-19-11

    G.Eu.S.,

[SARAH SMITH - APPELLANT]                      O P I N I O N

Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2016 AB 0010

Judgment Affirmed

Date of Decision: December 30, 2019

APPEARANCES:

    *Todd A. Workman* for Appellant

    *Justin Kahle* for Appellee

Case No. 9-19-11

**WILLAMOWSKI, J.**

{¶1} Appellant Sarah Smith ("Sarah") brings this appeal from the judgment of the Court of Common Pleas of Marion County, Family Division terminating her parental rights and granting permanent custody to Appellee Marion County Children Services ("the Agency"). On appeal, Sarah claims that the trial court erred 1) in finding that the Agency made reasonable efforts to reunify the family; 2) in finding that the child could not be returned to the home in a timely manner; and 3) in finding that the termination of the parental rights was in the best interest of the child. For the reasons set forth below, the judgment is affirmed.

*Procedural Background*

{¶2} This case arises from a complaint filed on January 12, 2016, alleging that G.Eu.S. and his siblings in the home were dependent children as drug trafficking and drug use was allegedly occurring in the home.[1] Doc. 1. G.Eu.S. was listed as being born in December of 2013, to Sarah and Shane Smith ("Shane"), so was only two years old at the time of the complaint. *Id.* The complaint requested that protective supervision be granted to the Agency and that G.Eu.S. would remain in the home. Doc. 1 and 3. On February 10, 2016, the trial court appointed Mary Kay Crowder ("Crowder") as the guardian ad litem for G.Eu.S. Doc. 11. An adjudication hearing was held before a magistrate on March 11, 2016, at which the

---

[1] In addition to this child, four other children were listed in the complaint.

-2-

magistrate found G.Eu.S. to be a dependent child. Doc. 18. The trial court subsequently reviewed the evidence and adopted the decision of the magistrate. Doc. 19. The magistrate held a hearing of disposition on April 8, 2016, and ordered that G.Eu.S., would remain in the custody of his parents under the protective supervision of the Agency. Doc. 20. The trial court adopted this disposition on May 2, 2016. Doc. 21.

{¶3} On September 9, 2016, the Agency filed a motion for an emergency removal of G.Eu.S. and three of his siblings[2] from the home. Doc. 25. The basis for the removal was the continued use of drugs by Sarah and Shane; alleged instances of domestic violence between Sarah and Shane; eviction from the family home; the children failing to attend school; and failure to follow the safety plan. *Id*. The trial court granted emergency custody to the Agency. Doc. 26. An amended case plan was submitted by the Agency on September 15, 2016. Doc. 28. Per the case plan, G.Eu.S. was placed in a certified foster home on September 9, 2016. *Id.* As part of the case plan, Sarah and Shane were required to complete assessments for addiction and mental health issues within 30 days, and follow the recommendations. *Id*. Sarah and Shane were also required to engage in services for domestic violence issues within 30 days. *Id*. Both were required to submit to random drug screens. *Id*. G.Eu.S. was originally placed in a foster home with his

---

[2] His oldest sibling was excluded from the removal as that child was not in the home at the time of the removal. See Doc. 23.

younger sister. Doc.86. On October 27, 2016, G.Eu.S. and his younger sister were moved to a second foster home so that they could be placed with their older sister. Doc. 32. G.Eu.S. remained in the foster home with his sisters until June 9, 2017, when he was moved to a different foster home in a different county. Doc. 42. G.Eu.S. remained in that home until April 3, 2018. Doc. 86. This placement was disrupted due to violence towards the family members and others. *Id*. G.Eu.S. was then moved to a fourth foster home with a family near Toledo. *Id*.

{¶4} On June 11, 2018, the Agency filed a motion for permanent custody of G.Eu.S. and his siblings. Doc. 79. The motion alleged that Sarah and Shane had 1) failed to follow through with the drug treatment recommendations; 2) continued to use drugs in the presence of the children; 3) failed to comply with requested drug screens at times; 4) failed to maintain appropriate legal income; 5) failed to maintain appropriate housing; 6) failed to implement parenting skills taught to them; 7) failed to refrain from criminal activity; and 8) engaged in domestic violence. *Id.* Crowder filed her report to the court on June 25, 2018. Doc. 86. Crowder noted that G.Eu.S.'s behaviors had improved and that he had started to bond with his foster parents. *Id*. at 6. She noted that the foster parents would consider adopting G.Eu.S. if the court granted permanent custody to the Agency. *Id.* Crowder also noted that per the reports from the foster parents, G.Eu.S. does not mention his siblings other than to complain about them and only mentions Sarah about once a month. *Id*. Based upon everything she had reviewed, Crowder stated that she did not believe

Sarah would be able to care for the children in the near future. *Id.* at 8-9. Crowder concluded that although she hoped the siblings could maintain contact with each other, it was her opinion that it would be in G.Eu.S.'s best interest to grant the Agency's motion for permanent custody. *Id.* at 9. Crowder filed a supplemental report on November 27, 2018. Doc. 138. In that report, Crowder stated that G.Eu.S.'s violent and defiant behaviors were continuing and that the foster parents indicated that they were worse after visits. *Id.* at 8. As a result, G.Eu.S.'s visits had been reduced to every other week as his counselor had indicated that the visits were interfering with his progress. *Id.* She noted the following.

> **Caring for [G.Eu.S.] is a very difficult job. In addition to past exposure to drugs and violence, there are increasing concerns that he has been the victim of sexual abuse by an unidentified abuser. His ultimate recovery from the trauma and neglect he has endured will require years of counseling and intentional, patient parenting. At last report the Hamiltons remain willing to adopt [G.Eu.S.].**

*Id.* at 9. Crowder did not change her recommendation about granting the Agency permanent custody of G.Eu.S. *Id.* at 12.

{¶5} Hearings on the motion for permanent custody were held on September 18 and October 31, 2018. Doc. 140. On December 27, 2018, the trial court issued its judgment terminating the parental rights of Sarah and Shane. *Id.* In its judgment, the trial court made the following findings.

> **The evidence shows that the children have been placed in various foster homes. Each child has experienced significant trauma and show signs of post-traumatic stress disorder. The children are at**

> **various levels of treatment for their trauma and post-traumatic stress disorder.**
>
> **\* \* \***
>
> **[G.Eu.S.] is 4 years old and will be 5 years old in December.  He also has behavioral and emotional concerns and tends to be aggressive towards his peers when frustrated.  These behaviors are exacerbated when he visits family at the agency.  Recently the visits have been reduced from one week to every two weeks because of the disruptions caused by [G.Eu.S.].**

*Id*. at 2-3.  The court found that G.Eu.S. had been in the temporary custody of the Agency for 12 out of the prior 22 months.[3]  *Id*. at 3.  The court also found that the parents had failed to remedy the conditions which required G.Eu.S. to be removed from the home and that the Agency had made reasonable efforts to reunify the family.  *Id*. at 4.  The trial court then granted the Agency permanent custody of G.Eu.S. and his siblings.  *Id at 4-5.*  Sarah filed a timely notice of appeal from this judgment.[4]  Doc. 145.  On appeal, she raises the following three assignments of error.

### First Assignment of Error

**The trial court erred in finding that the Agency made reasonable efforts to reunify the family as required under Ohio Law.**

---

[3] The trial court noted in its judgment entry that the Agency filed its motion for permanent custody on November 29, 2017.  Doc. 140.  However, a review of the record shows that no such motion appears on the docket until June 11, 2018.

[4] Sarah also appealed the terminations of parental rights in the other three cases, which were assigned appellate numbers 9-19-09, 9-19-10, and 9-19-12.

**Second Assignment of Error**

**The trial court erred when it determined that the children could not be returned in a timely manner.**

**Third Assignment of Error**

**The decision of the trial court is not in the best interest of the child and the determination was against the manifest weight and sufficiency of the evidence.**

In the interest of clarity, the assignments of error will be discussed out of order.

*Legal Standard*

**{¶6}** All of the assignments of error allege that the trial court erred in terminating the parental rights of Sarah. The right to parent one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id*. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the**

**agency that filed the motion for permanent custody and that any of the following apply:**

**(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \* and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**\* \* \***

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from the home.**

**(2) With respect to a motion made pursuant to [R.C. 2151.413(D)(2)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

> **If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding. The court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan.**
>
> **(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following.**
>
> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *.**
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.**
>
> **(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of

-9-

parental rights have been established. *In re S.L.*, 3d Dist. Shelby Nos. 17-17-17, 17-17-18, 17-17-19, 2018-Ohio-900, ¶ 24.

**{¶7}** The determination whether to grant a motion for permanent custody requires a two-step approach. *In re L.W.*, 3d Dist. Marion Nos. 9-16-55, 9-16-56, 2017-Ohio-4352, ¶ 5. The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances applies, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

*Trial Testimony*

**{¶8}** During the trial, the Agency presented the following evidence relevant to Sarah and G.Eu.S.[5] Julie Weyandt ("Weyandt") testified that she provided counseling services for G.Eu.S. starting in September 2017. September 18, 2018 Tr. at 6-7. The diagnosis was Generalized Anxiety Disorder and Intermittent Explosive Disorder with signs of PTSD. *Id.* at 9. Weyandt referred G.Eu.S. to a psychiatrist for evaluation for bipolar issues as there appeared to be biochemical issues. *Id.* Weyandt stopped treating G.Eu.S. in March of 2018 because he was transferred to another foster home. *Id.* at 12. When therapy ended, she had seen some improvements in his ability to self-calm, but the same diagnosis was present. *Id.* at 13-14. Therapy showed that G.Eu.S. had a need for power and control and

---

[5] Since the father is not appealing we will not address the testimony related to him. Likewise, we will not address the information regarding the other children in this opinion.

showed that he was aggressive and sought revenge. *Id*. at 15. G.Eu.S. showed a need for protection and food as his play therapy had an underlying theme of a female figure saving him from a male figure. *Id*. Weyandt stated on cross-examination that part of G.Eu.S.'s issues existed because of the multiple placements during his time in foster care. *Id*. at 24. In Weyandt's opinion, G.Eu.S. would continue to need counseling and treatment for years. *Id*. at 26.

{¶9} Dominic Berg ("Berg") testified that he is a counselor at the Marion Area Counseling Center ("MACC"). *Id*. at 28. Berg did one of Sarah's mental health and drug assessments in April of 2018. *Id*. at 43. Berg also testified that Sarah previously been involved with MACC and had undergone an initial assessment on April 10, 2017. *Id*. at 50. Sarah had been diagnosed with a mood disorder, depression, and anxiety. *Id*. at 46. In counseling, he was working with Sarah to help her identify triggers that caused her to relapse into her addictive behaviors. *Id.* at 45. Between her appointment on May 4, 2018, and August 2018, Sarah did not attend individual sessions or her group sessions. *Id*. at 46. Since Sarah only missed two individual sessions, her treatment was not terminated. *Id.* at 49. Berg testified that Sarah returned to therapy on August 14, 2018, and was referred to Leanne Adkins for counseling due to his schedule. *Id*. at 46. Since her return to counseling, Sarah had engaged in counseling on a weekly basis and was making some progress. *Id*. at 50. Berg indicated that Sarah was sincere in her desire

to seek treatment and was still active in treatment, but it would be a lifelong issue. *Id.* at 56-57.

{¶10} Lindsay Cochran ("Cochran") testified that she is a probation officer for the Marion Municipal court. September 18, 2018 Tr. at 89. She had been working with Sarah since April of 2017. *Id*. at 90. The primary focus of Sarah's probation is sobriety. *Id*. at 91. Additionally, Cochran and Sarah are focused on helping Sarah obtain her GED and maintaining her housing. *Id*. Cochran indicated that Sarah's last positive drug screen occurred in August. *Id*. at 92. That screen revealed multiple illegal substances in Sarah's system, though Cochran indicated that the variety of drugs was likely the result of the methamphetamine that Sarah admitted to taking being contaminated with other drugs. *Id*. at 127. Cochran then spoke with Sarah and sent her back to counseling as well as increasing her screenings to two times a week. *Id*. Since then, Sarah has tested negative. *Id*. When Sarah came in on August 1, 2018, she had already called Cochran and admitted that she had relapsed. *Id*. at 95. Before that, Sarah's last relapse was in January of 2018. *Id*. at 94. Cochran sent Sarah for inpatient treatment at that time and Sarah was compliant with the treatment. *Id*. at 94-95. Sarah left the inpatient treatment facility and continued with the daily programming. *Id*. at 95. Cochran testified that Sarah had not had any drug related issues in 2017. *Id*. at 97. However, Sarah had not yet obtained her GED and they remained focused on her sobriety for now. *Id*. at 97. Cochran also testified that Sarah had managed to find and maintain housing with

the assistance of MACC. *Id*. at 98. According to Cochran, Sarah's mental health issues of depression and anxiety are big factors in her addiction. *Id*. Stress, such as upcoming court dates, also played a role in Sarah's relapses. *Id*. at 99. In June of 2018, Sarah had left town because she was trying to avoid her triggers to avoid a relapse. *Id*. at 100, 109. Cochran testified that Sarah contacts her when she leaves town, though not always before doing so, and is generally honest when she relapses. *Id*. at 101, 109, 126. As a result of Sarah's honesty and regular contact, Cochran testified that no lengthy jail sentences were imposed for violation of the terms of probation. *Id*. at 109-112. Cochran testified that being on probation is helping Sarah, that she still is being tested two times a week, and she has been testing negative for drug usage. *Id*. at 128-29.

{¶11} Next, the Agency called Sarah to testify under cross-examination. Sarah testified that she had been at her current residence since May of 2018. *Id*. at 187. She admitted that the Agency had been involved with her family for around five years and she has continuing issues with sobriety. *Id*. at 190. Sarah testified that she had been to multiple recovery programs but had only successfully completed two of them. *Id*. at 192-94. Sarah admitted to relapsing in June of 2018 and having a positive drug test in August 2018. *Id*. at 201. She then returned to treatment in August 2018. *Id*. at 206. Sarah also admitted to being the victim of domestic abuse at the hands of Shane. *Id*. at 212. This ended when she left the relationship at the end of 2017. *Id*. at 213.

{¶12} Upon questioning by her own counsel, Sarah testified that her sobriety issues arise out of her mental illness. *Id*. at 215. She tends to relapse when situations become overwhelming and then feels worse because she failed herself and her children. *Id*. at 222-23. Sarah has tried different medications and combinations of medications as well as therapy to treat her mental illness, but nothing had worked at the time of the hearing. *Id*. at 234. According to Sarah, her most recent relapse was precipitated by the Agency's motion for permanent custody and the delays in court hearings. *Id*. at 236. Sarah testified that she has contact with her probation officer at least two times a week and has never refused a drug screen from probation. *Id*. at 239-40. She admitted to refusing one drug screen from the Agency because she was frustrated with her case worker and felt that the Agency had not really offered her much help. *Id*. at 240-42. Sarah testified that she had worked very hard on the case plan, but the Agency makes promises without following through. *Id*. at 241-46. Her current residence was in Marion, but she would like to get out of town. *Id*. at 248.

{¶13} Sarah also testified that she currently sees a counselor every week. *Id*. at 254. She felt like for the first time in her life she had a plan with a goal of sober living. *Id*. at 257. Although Sarah still struggled with her mental illness and addiction, she felt better in her current situation and did not want to lose her children. *Id*. at 258-59. Sarah also admitted that G.Eu.S. had witnessed her be the victim of domestic violence at the hands of Shane. *Id*. at 262-63. However, she testified that

her current boyfriend is not violent. *Id*. at 264. Sarah also testified that when she left town to try and avoid a relapse, she still came back for her visits. *Id*. at 271.

{¶14} Shane testified that he would not be an appropriate placement for G.Eu.S., but that he loved his child. *Id*. at 290. Shane indicated that he was the one responsible for many of Sarah's relapses and that he had been the perpetrator of domestic violence against Sarah and the children. *Id*. at 288-290. He requested that the trial court give custody of G.Eu.S. to Sarah. *Id*. at 294. Although Shane indicated he was willing to pay child support to Sarah, he also testified he did not like to do so because she had not earned it. *Id*. at 296-97. He also admitted that he works "under the table" a lot to avoid paying child support. *Id*. at 299. However, he testified that he did not believe Sarah would use the money for drugs as long as he was not around her. *Id*. at 298.

{¶15} The next witness to testify on behalf of the Agency in G.Eu.S.'s case was McKenzie Severns ("Severns"), who was the ongoing caseworker with the Agency. *Id*. at 305. Severns testified that she officially began working with the family in January of 2016. *Id*. at 306. At that time, the entire family was living with Sue Rollison ("Rollison"), the maternal grandmother. *Id*. A safety plan was in place and Rollison was the plan monitor. *Id*. at 307-308. The safety plan ended when Sarah and Shane tested clean for a period of time and seemed to be doing well. *Id*. at 309. In April or May of 2016, Sarah, Shane, and the children moved to a new home where they stayed until August. *Id*. at 311. Sarah then reported to Severns

that she had relapsed because the neighbors were using, so Sarah and the children moved in with Shane's mother. *Id.* At that time, Shane did not live with the family at the request of the Agency because he was using again and was a trigger for Sarah. *Id.* at 312. Severns testified that she went to the home at the beginning of September because two of G.Eu.S's siblings missed too much school. *Id.* A new safety plan was instituted on September 2, 2016, when Severns learned that Shane was back in the home and Sarah was using again. *Id.* On September 9, 2016, G.Eu.S. was removed from the home and the plan was ended after the monitor reported that both parents were using again and both parents tested positive for drug usage. *Id.* at 312-13. Additionally, Sarah had a black eye and admitted that Shane had hit her again. *Id.* at 313. G.Eu.S. had been in the temporary custody of the Agency since then. *Id.* at 314.

{¶16} G.Eu.S. was immediately placed in a foster home with his younger sister. *Id.* at 322. That placement was disrupted because the foster parents were not used to dealing with small children, so the children were moved to the foster home with their older sister. *Id.* at 323. Later, G.Eu.S. was moved to another home without any of his siblings. *Id* at 323. He was with that family from June 9, 2017 until April 3, 2018, when he was removed due to his behaviors. *Id* at 324. Since then, G.Eu.S. has been placed in a home near Toledo. *Id.* Severns testified that G.Eu.S. appeared to have bonded with his foster parents, but had made very little progress. October 31, 2018, Tr. at 33-34. G.Eu.S. had been in multiple placements,

but has gotten progressively more aggressive. *Id*. at 33. G.Eu.S. was medicated and in therapy at that time and was slowly becoming less aggressive. *Id*. Severns admitted during her testimony that the Agency did not plan to try and place the siblings together because they do better separately. *Id*. at 58-59.

{¶17} Severns testified that the case plan required Sarah to accomplish ten goals. The first was to complete substance abuse and mental health assessments and to follow up with the recommendations. *Id*. at 11. Sarah completed the assessment, but was still working on achieving sobriety. *Id*. Second, Sarah was to have no drugs or paraphernalia around the children and not use around them. *Id*. at 13. Severns testified that this is not an issue because the children are in foster care. *Id*. at 14. Severns also testified that Sarah complied with this requirement by openly telling Severns any substance she was taking, including prescribed drugs. Third, Sarah was required to sign all releases, which she did. *Id*. at 14-15. Fourth, Sarah was to comply with all requested drug screens. *Id*. at 15. Severns testified that Sarah usually complied and there was only one refusal in the record. *Id*. Fifth, Sarah was to maintain a legal form of income. *Id*. Sarah completed this requirement by receiving social security, but is not employed. *Id*. at 16. The sixth goal was to maintain appropriate housing. *Id*. Throughout the case plan, Sarah had been in multiple residences. *Id*. Her current housing was a one bedroom apartment, which would not be appropriate for the children. *Id*. at 17. Seventh, Sarah was to complete parenting classes. *Id*. Severns testified that Sarah had completed the classes and

does well in the visits. *Id*. at 18. Severns indicated that she thought Sarah had completed this objective. *Id*. Sarah had visits with the children every Thursday and had attended all of her visits. *Id*. at 22. Eighth, Sarah was required to avoid criminal activity. *Id*. at 19. At first, Sarah had additional trouble in municipal court, but has been compliant recently. *Id*. Ninth, Sarah was to comply with the terms of her probation. *Id*. at 20. Severns indicated that she believed Sarah was working on that objective. *Id*. Lastly, there was to be no more domestic violence and they were to learn how to handle the difficulties in their relationship. *Id*. Severns testified that this issue was resolved by Sarah and Shane ending their relationship. *Id*. The last instance of domestic violence reported was in July 2017. *Id*. at 21.

{¶18} Severns testified that she did not believe that Sarah had completed the case plan. *Id*. at 24. She testified that the Agency attempted to assist Sarah by providing vouchers for transportation to various services and even providing rides. *Id*. 15 24. According to Severns, there were periods that Sarah was clean and sober and working hard on the case plan, and then she relapses. *Id*. at 26. There has also been inconsistency on housing during that time. *Id*. This pattern has been repeated for the two years that the Agency has had the children. *Id*. Severns also testified that the Agency offered housing assistance, but it was lost during a relapse. *Id*. at 37. The Agency also offered transportation and parenting classes, which were utilized. *Id*. The Agency also made multiple referrals for treatment and helped with utilities. *Id*. The Agency referred Sarah and Shane to the Family First Counsel, but

the parents did not utilize the services. *Id.* at 38. Due to the lack of stability, the Agency requested that the parental rights be terminated. *Id.*

{¶19} On cross-examination, Severns testified that she had requested many drug screens and that Sarah had only refused one. *Id.* at 44. She also testified that Sarah was unable to work, which is why she receives social security. *Id.* at 45. Sarah's last conviction was on March 23, 2017, which was the basis for her current probation. *Id.* at 48-49. Severns admitted that Sarah has substantially completed the case plan, but stated that the lack of stability prevents the Agency from returning G.Eu.S. to Sarah. *Id.* at 50-51. Severns agreed that Sarah loves her children and is a caring, loving mother. *Id.* at 53, 59. However, Sarah consistently relapses, which is detrimental to the children. *Id* at 51.

{¶20} Ryan Hamilton ("Ryan") testified that he was the foster father for G.Eu.S. and had been so for approximately seven months. *Id.* at 64-65. When G.Eu.S. arrived, he did not want Ryan in the same room with him, but now seeks Ryan out. *Id.* at 66. Based upon this, Ryan believes that G.Eu.S. has bonded with him. *Id.* Ryan testified that although he and his wife had not really talked about adopting G.Eu.S., they might do so if permanent custody was granted to the Agency. *Id.* at 69. On cross-examination, Ryan indicated that G.Eu.S. has a nearly two hour drive to visit Sarah and his siblings. *Id.* at 70. He had never met Sarah. *Id.* at 71. Although Ryan indicated that G.Eu.S.'s aggression had recently gotten worse, the

counselor had told him it was because G.Eu.S. was "beginning to work through things." *Id.* at 74.

{¶21} Anne Hamilton ("Anne") testified that she was G.Eu.S's foster mother for the prior seven months. *Id.* at 77. She testified that she was bonded with G.Eu.S. and that he was affectionate and loving towards her. *Id.* Although G.Eu.S. was visiting with his siblings and Sarah, he was resistant to going and had increased behavioral issues afterwards. *Id.* at 80. According to Anne, G.Eu.S. had told her he did not want to go to the visits anymore. *Id.* at 82. Anne testified that she and Ryan had discussed the possibility of adopting G.Eu.S. and were very interested in doing so. *Id.* at 82. On cross-examination, Anne admitted that G.Eu.S. is taken to visits by a third party and she has never been to a visit to see how he interacts with his siblings. *Id.* at 84-85. Her opinion was that G.Eu.S. was acting out recently because he was afraid he would be sent to another placement and was starting to process the loss of his last foster family. *Id.* at 87-88.

{¶22} Sarah presented the testimony of Rollison in her case. Rollison testified that Sarah's drug problems started after her infant son died in September 28, 2002. *Id.* at 95. At that time, the doctor's started Sarah on antidepressants. *Id.* Then Sarah hurt her back and the doctors gave her opiates for the pain. *Id.* This led her to an addiction to the pain medication. *Id.* According to Rollison, Sarah was doing well with her addiction until 2012, when she came home to find her cousin murdered in Sarah's home. *Id.* at 97. This caused Sarah to relapse and the Agency

became involved with the family. *Id.* Soon after the children were removed from Sarah, Sarah had more tragedies in her life when her brother-in-law was diagnosed with terminal cancer and Sarah's father died in a car accident. *Id.* Rollison testified that she wished she could take the children, but her housing was not appropriate. *Id.* at 98-99. Rollison testified that she informed the Agency that she needed help with housing and furnishing to be able to take the children, but they did not help. *Id.* at 99-100. The only aid offered by the Agency was wet wipes and gas cards. *Id.* at 100. Rollison indicated that she goes to the visits with Sarah and is proud of how hard Sarah is trying. *Id.* at 101. According to Rollison, Sarah has been clean for a couple of months because her apartment is well kept, which is not the case when Sarah is using. *Id.* at 102, 125.

{¶23} Zachary Aldrich ("Aldrich") testified that he is the older brother of G.Eu.S. and the other children. *Id.* at 147. He would attend the visits with the rest of the family, and described them as fun, playful, and loving. *Id.* at 149. When the visits ended, the children would be sad to go. *Id.* At the visits, Aldrich testified that Sarah played around with the children and corrected bad behavior. *Id.* at 150. Aldrich indicated that Sarah was not using at the time because her behavior was different when she was using. *Id.* at 152. Aldrich was concerned he would lose contact with his siblings. *Id.* at 154. Aldrich indicated he wanted to stay in contact with his siblings, but was not hopeful that G.Eu.S.'s foster parents would allow it. *Id.* Aldrich admitted on cross-examination that Sarah has shown a pattern of being

clean and then relapsing. *Id.* at 156. However, he also testified that Sarah has not mistreated the children, only Shane did that. *Id* at 157.

**{¶24}** Sarah then testified again on her own behalf. She testified that she receives social security and cannot work due to her back issues and diagnoses of PTSD, depression, anxiety, and bipolar disorder. *Id.* at 161. She admitted that her home is not large enough for the children, but testified that she cannot get a new home without having the kids in the home because she needs the assistance she would get for having the kids to pay for the larger home. *Id.* at 161. Sarah also admitted that she had been in treatment for her mental health and drug addiction issues for years and was enrolled in an intensive outpatient treatment program. *Id.* at 166-67. Sarah had approximately 28 more classes in this program before she began the relapse prevention program. *Id.* at 167. She then was planning on taking the Thinking for a Change program which would begin January 28, 2019. *Id.* Sarah indicated that she tended to relapse in the summer because that was when her one son was born and died two months later, so she feels stress around that time. *Id.* at 173. Sarah claimed that she had done more than 50 tests for the Agency and had only refused one. *Id.* at 172, 175. She refused the one because she was angry that Severns had interrupted her one hour visit with the children to discuss an issue rather than waiting for the visit to be over. *Id.* at 175. Severns wanted to discuss a girl who had overdosed outside of Sarah's apartment and who Sarah had tried to help by calling 911 and trying to revive her with cold water. *Id.* at 175-77. Sarah testified

that after the visit she asked to speak with Severns regarding what had happened at the apartment and Severns refused. *Id*. at 176. Severns then asked Sarah to take the drug screen and Sarah refused because she was angry. *Id*. at 176, 179.

{¶25} Sarah also testified that her last criminal charge was in 2017 and she would be released from probation in April of 2019. *Id.* at 174, 187. She was no longer the victim of domestic violence because she had ended her relationship with Shane. *Id*. at 189. She had a boyfriend at the time of the hearing who is also an addict, but he is active in drug court with daily testing which is clean. *Id*. at 192. Sarah admitted that her drug usage and the trauma witnessed by the children due to the domestic violence had negatively affected them. *Id*. at 205, 211. Sarah admitted that during the time G.Eu.S. was in the temporary custody of the Agency, she had suffered multiple relapses. *Id*. at 214. However, Sarah was frustrated because when she was clean for an extended period, the Agency did not allow her any additional time with the children other than the one hour a week. *Id*. at 215. Sarah also testified that she doubted she would still be allowed contact with G.Eu.S. if her rights were terminated. *Id*. at 216.

{¶26} When questioned by the trial court, Sarah testified that she was on no medications at that time. *Id*. at 218. However, MACC wanted to start her on medication for her mental health issues. *Id*. Sarah testified that she had never had grief counseling to help her deal with the tragedies in her life. *Id*.

{¶27} After Sarah rested her case, Shane made a statement to the trial court. He stated that although he did not always agree with Sarah, she was a good person and she loved her children. *Id* at 223. He blamed himself for Sarah's drug use and accepted that he was solely responsible for the domestic violence. *Id*. at 222. He requested that the trial court return the children to Sarah. *Id*. at 223.

*Could G.Eu.S. be returned within a timely manner?*

{¶28} The first question in determining whether to grant an Agency's motion for permanent custody is whether one of the provisions of R.C. 2151.414(B) apply. A review of the statute indicates that G.Eu.S. had been in the temporary custody of the Agency for more than twelve out of a twenty-two month period. The statute provides that the time calculation begins on the earlier of the date of adjudication or sixty days after the child is removed from the home. R.C. 2151.414(B)(1). Here, G.Eu.S. was adjudicated as a dependent child on April 1, 2016. Doc. 19. However, the child was not removed from the home and placed into the temporary custody of the Agency until September 9, 2016. Sixty days after this would be November 8, 2016. The earlier of these two dates is April 1, 2016, and would be the date used to start the calculation of time if the child had been removed from the home and placed in the temporary custody of the Agency at that time. Instead, he was placed under protective supervision of the Agency. Thus, we do not count any of the time between that date and the actual removal because G.Eu.S. was not in the temporary custody of the Agency during that time and the statute only counts the time in

temporary custody. See R.C. 2151.414(B)(1)(d). The time would begin to run on September 9, 2016. The motion for permanent custody was filed on June 11, 2018. Between September 9, 2016 and June 11, 2018, G.Eu.S. was in the temporary custody of the Agency at all times. Thus, G.Eu.S. was in the temporary custody of the Agency for approximately 21 months out of a twenty-two month period and the trial court found as such. See Doc. 140 at 3. This time frame meets the statutory requirement of R.C. 2151.414(B)(1)(d). "Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents." *In re S.W.*, 3d Dist. Marion Nos. 9-18-29, 9-18-30, 2019-Ohio-2068, ¶ 20 (quoting *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, at ¶ 14).

{¶29} Sarah argues in the second assignment of error that the trial court erred by finding that G.Eu.S. could not be returned to the home in a timely manner. Since G.Eu.S. had been in the temporary custody for 21 out of a consecutive 22 month period, the trial court was not required to make a finding that he could be returned to Sarah's home within a reasonable time. The second assignment of error is overruled.

*Best Interests of the Child*

**{¶30}** Once a trial court has determined that any provision set forth in R.C. 2151.414(B)(1) applies, the second step of the analysis is whether granting the Agency's motion is in the best interest of the children. *In re S.W., supra* at ¶ 21. The factors that must be considered are set forth in R.C. 2151.414(D) as discussed above. In this case, the trial court specifically stated granting the motion was in the best interest of G.Eu.S. Doc. 152 at 4. A review of the record shows that extensive evidence was provided regarding G.Eu.S.'s relationships with Sarah, Shane, the siblings, and the foster parents. The testimony was that he was bonded with Sarah, loved his siblings, and was bonded with his foster parents. There was no dispute that Sarah loved G.Eu.S. R.C. 2151.414(D)(1)(a). Crowder presented evidence which showed that G.Eu.S. was too young to really express his wishes, but indicated that G.Eu.S. had less emotional connection to Sarah, although there was a strong sibling bond. R.C. 2151.414(D)(1)(b). As discussed above, the trial court noted that G.Eu.S. had been in the temporary custody of the agency for more than 12 months out of a consecutive 22 month period. R.C. 2151.414(D)(1)(c). The trial court made a specific finding that G.Eu.S. was in need of a legally secure permanent placement that was not being met by Sarah or Shane. R.C. 2151.414(D)(1)(d) and Doc. 140 at 3. A review of the evidence shows that there was clear and convincing evidence to show that the termination of Sarah's parental rights was in the best interest of G.Eu.S. Thus the judgment was supported by sufficient evidence and

was not against the manifest weight of the evidence. The third assignment of error is overruled.

*Reasonable Efforts to Unify*

{¶31} In the first assignment of error, Sarah claims that the trial court erred by finding that the Agency made reasonable efforts to unify the family. R.C. 2151.412 requires the Agency to develop a case plan with the general goal of reunification. The Agency is expected to make a reasonable effort by acting diligently and providing services appropriate to the family's need to predicate reunification. *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95. However, "reasonable efforts" does not mean all available efforts as such a definition would always provide an argument that the Agency did not try everything possible. *Id*. (citing *In re M.A.P.*, 12th Dist Butler Nos. CA2012-08-164, CA2012-08-165, 2013-Ohio-655).

{¶32} A review of the record in this case shows that the Agency tried multiple times to help Sarah. At the beginning of the case, the Agency attempted a safety plan to try and prevent the removal of G.Eu.S. from the home. The Agency helped Sarah and Shane to find housing. When Sarah lost the housing, the Agency tried to help her get away from Shane so that she would not relapse into drug usage and not be a victim of domestic violence. When the Agency learned that two of G.Eu.S.'s siblings had missed too much school within the first month and were considered truant, the Agency worked with Sarah to once again set up a safety plan

so that the children could remain with her. Approximately one week later, the Agency had to remove G.Eu.S. from the home because of Sarah's continued use of drugs, the state of the home, and the domestic violence. The Agency worked with Sarah for years trying to assist her with her mental health and addiction issues. Severns testified that they made all the referrals to the various agencies. Severns also testified that they worked to facilitate visits between Sarah and G.Eu.S. Although Sarah had substantially completed the case plan, including the parenting classes referred by the Agency, the one area she failed was overcoming her addiction. She would go for a few months without using, but would eventually relapse. After years of Sarah repeating the pattern of getting clean through various programs and then relapsing, the Agency decided to move for termination of Sarah's parental rights to give G.Eu.S. a stable environment. Sarah herself admitted that she had relapsed within a few months prior to the permanent custody hearings. No one doubted Sarah's desire to overcome her addiction so that she could be with her children or her love for her children. However, the record is clear that even after years of trying, Sarah still had not accomplished this goal. There was very little, if anything, more the Agency could have done to assist Sarah in this aspect of the case plan. The record shows that there was credible evidence that the Agency made reasonable efforts to reunify Sarah and G.Eu.S. Therefore, the trial court did not err in making such a finding. The first assignment of error is overruled.

**{¶33}** Having found no errors prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Marion County, Family Division, is affirmed.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/hls**