[Cite as *In re F.W.*, 2024-Ohio-5431.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

IN RE:                                    :
                                          :
    F.W. and K.W.,                      :    Case Nos. 24CA6
                                          :
    Adjudicated Neglected               :
    and Dependent Children.             :
                                          :
                                          :
                                          :    <u>DECISION AND JUDGMENT</u>
                                          :    <u>ENTRY</u>
                                          :
                                          :

---

**<u>APPEARANCES</u>**:

Richard D. Hixson, Zanesville, Ohio, for Appellant.

Brittany E. Leach, Athens County Assistant Prosecuting Attorney, Athens, Ohio, for Appellee.

---

Smith, P.J.

{¶1}   Appellant, the father of the minor children F.W., age 15, and  K.W., age 13, appeals the trial court's judgment that placed his two children in the permanent custody of Athens County Children Services ("the agency").  In his first assignment of error, Appellant argues that the trial court's finding that the children cannot be placed with him within a reasonable time or should not be placed with him is against the manifest weight of the evidence.  In his second assignment of error, Appellant asserts that the trial court's finding that placing the children in the

agency's permanent custody is in their best interest likewise is against the manifest weight of the evidence. In his third assignment of error, Appellant contends that the trial court erred by failing to appoint an attorney to represent the children. Upon review, we do not find any merit to Appellant's assignments of error. Accordingly, we overrule Appellant's three assignments of error and affirm the trial court's judgment.

## FACTS

{¶2} On June 24, 2021, the agency filed complaints that alleged the children are neglected and dependent. The complaints alleged the following. On April 8, 2021, the agency received a report of educational neglect. Beginning in March 2020, none of the children consistently attended school. During the 2020-2021 school year, F.W. missed at least 94 school days, and K.W. missed at least 69 days of school. An agency caseworker subsequently spoke with the children's mother, and she admitted that the children had not been attending school. The mother assured the caseworker that the children would attend school, but the mother failed to fulfill her promise. For these reasons, the agency asked the court to grant it protective supervision of the children.

{¶3} On September 8, 2021, the trial court adjudicated the children neglected and dependent. The trial court later entered a dispositional order that granted the agency protective supervision of the children.

{¶4}  On May 16, 2022, the trial court granted the agency ex parte emergency custody of the children and set the matter for a shelter care hearing to be held on May 17, 2022.  The court subsequently continued the ex parte temporary custody order pending a full hearing.

{¶5}  On May 17, 2022, the agency filed a motion to modify the protective supervision order to a temporary custody order.  The agency asserted that the children's mother recently tested positive for methamphetamines and suboxone and that Appellant refused to submit to drug screens.  Additionally, the agency had concerns that "the parents have an alcohol abuse problem.  Their home and the property they live on is littered with beer cans."  The agency further alleged that (1) the family's home, "a small camper," is "in near deplorable conditions," with trash inside and outside the home, (2) the home lacks running water and receives "electricity from the home next door," (3) Appellant "has an anger management problem," and (4) the children have missed a significant number of days of school.

{¶6}  On June 28, 2022, the trial court granted the agency temporary custody of the children.

{¶7}  On May 9, 2023, the agency filed a motion to modify the disposition to permanent custody.[1]  The agency asserted that the children cannot be placed with either parent within a reasonable time or should not be placed with either

---

[1]In February 2023, the children's mother tragically and unexpectedly passed away.

parent and that placing the children in its permanent custody is in their best interests.

{¶8}   On October 20, 2023, the trial court held a hearing to consider the agency's permanent custody motion.  Stephanie Blaine, a kindship program coordinator, testified that she conducted a home study for a paternal aunt, but the home did not "meet the minimal safety standards."  She sought other potential relatives but none was available.

{¶9}   Caseworker Katie Schlegel likewise testified that she investigated a potential placement for the children, but the home study was not approved.

{¶10}  Caseworker David Driggs testified that he administered several drug tests to Appellant and that Appellant tested positive for methamphetamine, amphetamine, and THC.  Driggs did not provide specific dates for these positive test results, but the trial court admitted into evidence copies of the drug test results.  This evidence indicated that (1) in April 2023, Appellant tested positive for THC, (2) on January 30, 2023, Appellant tested positive for methamphetamine, amphetamine, and THC, and (3) in July, September, and October 2022, Appellant tested positive for amphetamine and methamphetamine.  Driggs stated that he attempted to test Appellant after April 2023, but he was unable to connect with Appellant.  Driggs further reported that beginning in July 2023, he did not make any further attempts to test Appellant due to "safety concerns."

{¶11} Caseworker Rebecca Inboden testified as follows. In April 2021, the agency entered into a voluntary case plan with the family to help resolve school truancy issues. The children "had not attended school during the majority of the 2020-2021 school year." The initial case plan objectives focused around ensuring that the children were attending school. Inboden was "going to the home on a regular basis [and] attempting to talk to the parents about the importance of the children attending school." She informed the parents that the children needed to consistently attend school "sooner than later"; otherwise, "there was possibly going to be some sort of sanctions forthcoming from the court." The parents never were able to ensure that the children attended school on a consistent basis.

{¶12} Inboden further testified that the agency had concerns regarding the family's housing. In September 2021, the family was living in a two-bedroom camper. For electricity, the family used electrical cords that connected to the home next door. Additionally, the camper did not have running water. The agency also had concerns about a lack of food in the home and potential refrigeration issues.

{¶13} In April 2022, the agency received a referral that the parents "were abusing substances." Inboden completed a home visit with the parents and asked them to submit to drug testing. The mother submitted to a test, and she tested positive for "illicit substances." The mother advised Inboden that "she did not know how those substances would have gotten into her system." Appellant refused

to take a drug test, and he did not explain why he would not submit to a drug test. Appellant "was very upset with the request" and did not believe that the test was necessary. Inboden stated that Appellant "was very amplified and kicking, knocking over objects," and "at one point[,] he had threatened to kill his sister-in-law."

{¶14} In May 2022, the children entered the agency's temporary custody. Before their removal, the children had been living in "unstable home conditions." The parents appeared to be abusing drugs, the children's older sister (who was 17 at the time but now is over the age of majority) was several months pregnant and had not received prenatal care, and the father of this unborn child (with whom the 17-year-old had an ongoing relationship) "was known to be drug involved and domestically violent."

{¶15} Once the children entered the agency's temporary custody, the agency amended the case plan to include goals related to alcohol and drug treatment, mental health, and housing. Inboden explained that "the family has a history of multiple moves and or [sic] their housing not being sanitary, organized, and potentially being a safety hazard."

{¶16} The agency also had concerns regarding the 17-year-old child's pregnancy. The parents claimed that they did not know that she was pregnant, even though "it would have been difficult for [the child] to hide a pregnancy of that

duration because she was nearly ready to give birth by the time the pregnancy was discovered."

{¶17} Inboden explained that Appellant wanted to be present for the birth of the 17-year-old's child, but the hospital had restrictions regarding the persons allowed in the room. Appellant was not allowed to be present and "he had to be escorted off of the property."

{¶18} Between July 2022 and July 26, 2023, Appellant tested positive for methamphetamine, amphetamine, THC, and suboxone. Inboden referred Appellant for a substance abuse assessment. Appellant was noncompliant between July 2022 through May 2023. He since has been "actively participating."

{¶19} Inboden also testified that she had heard comments suggesting that Appellant wanted to harm her. In late May 2022, she heard that Appellant had stated an "intention to place [Inboden] in a wood chipper." As a result, Inboden contacted her supervisor and the agency decided that Inboden no longer would be required to personally visit the family's home.

{¶20} In the summer of 2023, Inboden received a phone call from a mental health therapist who "reported having a duty to warn as [Appellant] had presented for a therapy session and verbalized intention for members of [Inboden's] family, or any other Children Services workers['] family to, 'come up missing if the agenc[y's] motion for permanent custody was granted.' " Inboden reported the

incident to her supervisor and to law enforcement officials. As a result of Appellant's threat, Inboden was advised not to "have any further face-to-face contact with" Appellant.

{¶21} Inboden stated that the case plan also required Appellant to engage in mental health services. She explained that Appellant "has a lengthy history of violent and or [sic] assaultive behavior towards adults that has been adjudicated through" Athens County Common Pleas Court. Inboden indicated that Appellant completed a mental health evaluation, but she does not know "what the recommendations were." She has been unable to determine whether Appellant "is emotionally or mentally healthy for parenting" due to "the safety precautions that have been put in place."

{¶22} In April 2023, Appellant was living with a paramour in the paramour's mother's house. Inboden explained that the children had difficulty processing Appellant's new relationship, given that their mother had passed away only a few months before Appellant started this new relationship.

{¶23} Inboden was unable to access the paramour's mother's home to determine whether it would be an appropriate home for the children. The agency nevertheless had received information that "multiple individuals" were "coming and going from that property, including teenagers living in a shed behind the house."

{¶24} As of the date of the permanent custody hearing, Inboden did not know if Appellant had appropriate housing for the children. Moreover, Inboden did not receive income verification from Appellant. She has "been told that he receives social security benefits." Inboden thus does not know if Appellant can provide for the children's basic needs.

{¶25} Inboden stated that the two children currently live in the same foster home, where they have lived since May 2022. She reported that the children "are thriving." If the agency is granted permanent custody, Inboden expects that the children will remain living in this home. The foster parents have indicated that they would be willing to adopt the children. Inboden explained that K.W. has been "holding out hope that she is going to go home, and it will be difficult for [her] to have that dream essentially go away."

{¶26} Inboden testified that the children have "come a long way since they've arrived in [the foster] home." She explained: "They have a close bond with their foster family. They attend school every day. They do not evidence any unexcused absences. They participate in family activities."

{¶27} Inboden explained that the agency requested permanent custody of the children because the agency "has had ongoing involvement with this family for a number of years, and it tends to always be related to the same issues": "Housing, lack of resources, . . . allegations of substance use, or dependence, concerns about

the mental health of one or both parents. One of the parents being . . . involved with the criminal justice system." Additionally, when the children were in Appellant's custody, they were not attending school on a consistent basis and their "education needs [were] not being met." Inboden does not believe that Appellant has made "sufficient progress with regard to the case plan activities and objectives in order to recommend reunification." Inboden stated that she knows that Appellant "loves his children dearly," but she is "worried for these children's safety, and . . . their stability if they were to reunify with" Appellant.

{¶28} Renee McKee, a clinician at Health Recovery Services, testified as follows. She has been working with Appellant since May 2023. Appellant currently takes suboxone, and, other than testing positive for marijuana, he has not had a positive drug test since July 2023. Appellant also completed a mental health evaluation.

{¶29} On July 14, 2023, Appellant stated that "if his children were taken that other . . . people's family members would come up missing." McKee reported the statement to authorities. McKee since has seen an improvement in Appellant's behavior, and she believes that he will continue to improve.

{¶30} Kelly Morman, the children's guardian ad litem (GAL), testified that she would not "recommend permanent custody at this time. The girls are clearly closely bonded with their extended family." However, she would not recommend

"that the girls be returned to their father at this time." Instead, she believed that "a lot of progress" still "needs to be made and a lot of concerns around housing . . . need to be addressed." Morman indicated that Appellant has "expressed remorse for past comments that have been made." She further suggested that Appellant has made "earnest progress." Morman would like to see Appellant continue to have clean drug screens, continue to engage in treatment, and obtain a stable and safe home. She recommended that the court give Appellant another three months to comply with all of the case plan goals.

{¶31} Morman reported that the children "are clearly determined" to remain with one another, and they "have been consistent in their desire to be reunified." In their current placement, the children seem to be "adjusting well" and "attending school regularly." They also are engaged in extracurricular activities. Morman stated that the children "seem to be connected to their foster parents, but [she] think[s] there is still a remaining kind of distance." Thus, Morman is uncertain whether keeping the children in the foster home is "a good long-term solution."

{¶32} Appellant did not testify, but his counsel asked the court to give Appellant more time to complete the case plan goals.

{¶33} On March 14, 2024, the trial court granted the agency permanent custody of the two children. The court first found that placing the children in the agency's permanent custody is in their best interests. With respect to the

children's interactions and interrelationships, the court found that (1) the children and Appellant have a "strong bond"; (2) Appellant regularly visits the children and the visits "go well"; (3) the children have been in the same foster home since May 2022; (4) before entering the agency's temporary custody, "the children were struggling with housing security and their education"; (5) since entering the agency's temporary custody, "the children have made tremendous strides as they have a stable environment that allows them to thrive"; (6) their "school attendance has significantly improved"; and (7) they "have a solid bond with their foster caregiver."

{¶34} The court considered the children's wishes and found that they would like to be reunified with Appellant. The court stated that the family "has a very strong bond and are very close to each other." The court further noted that the GAL "advocated that [Appellant] be given more time to complete his case plan goals for reunification purposes."

{¶35} The court additionally reviewed the children's custodial history. The court found that the case began on June 24, 2021, when the agency requested a protective supervision order due to concerns about the children's educational neglect. Nearly one year later, the court placed the children in the agency's temporary custody "due to a multitude of concerns that included the parents' substance use, continued educational neglect with the children missing school, and

housing instability as the family was residing in a camper that was in a deplorable condition." The children have been in the agency's continuous temporary custody since May 16, 2022.

{¶36} The court further found that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency permanent custody. The court noted that Appellant "has struggled with case plan requirements" but determined that he has made "some progress." The court commended Appellant for "engag[ing] in substance use treatment," but found that "housing insecurity still looms as well as [Appellant]'s ability to provide for the children's basic needs." The court declared that "[t]he children deserve the chance to succeed in life" and that they are "highly unlikely" to be able to succeed "if permanent custody is not granted to the agency." The court stated that awarding the agency permanent custody "will allow the children to be in a safe and stable environment that will provide them with the necessary resources to continue their success."

{¶37} The court also concluded that the children cannot be placed with Appellant within a reasonable time and should not be placed with Appellant. The court again noted that the "family is very close and bonded," but it determined that this "bond is not enough for permanent custody not to be granted to the agency." The court observed that the children entered the agency's temporary custody as a

result of their "parents' potential substance use, continued educational neglect, and deplorable housing conditions." The court recognized that Appellant "has taken steps to address his substance use and hopes that he continues to do so in the future." The court additionally noted that the children and Appellant have "gone through additional trauma during this case as Mother unexpectedly passed away." The court nevertheless did not believe that Appellant has made "the necessary progression." The court stated that Appellant has "documented anger issues toward the agency" and his "alleged threats of bodily harm have affected the progress in this case and ha[ve] not been properly addressed." The court further found that these anger issues have "affected his case plan progress and whether he can adequately and appropriately parent these children."

{¶38} The court additionally stated that Appellant has not verified that he has appropriate housing for the children. The court indicated that part of the problem with verifying Appellant's housing stemmed from his "behavior toward agency staff." The court found that Appellant "previously could not provide for the children's basic needs and that still appears to be the case." The court stated that it did "not feel comfortable that [Appellant] has verifiable income to support himself and his children as well as providing for their basic every day needs." The court found that "[t]he family has historically had the same issues that still remain

today.  They struggle with housing, lack of utilizing resources provided to them, substance use, and mental health or anger concerns."

{¶39} The court recognized that Appellant "loves his children and has made progress with his substance use," but it stated that other issues remain.  The court found that the children "appear to be thriving in their current environment by making strides emotionally, mentally, and educationally."  The court indicated that the children are receiving "the resources and support" that they did not receive while in their parents' care.  The court stated that if the children were returned to Appellant's custody, "they would be highly susceptible to falling back into the environment that they were previously removed from."

{¶40} The court thus found that (1) the children cannot be placed with Appellant within a reasonable time and should not be placed with Appellant and (2) permanent custody is in the children's best interests.  Accordingly, the court granted the agency's permanent custody motions.  This appeal followed.

ASSIGNMENTS OF ERROR

I.    THE TRIAL COURT ERRED WHEN FINDING THAT THE MINOR CHILDREN COULD NOT BE PLACED WITH FATHER WITHIN A REASONABLE TIME AND SHOULD NOT BE PLACED WITH HIM, AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II.   THE TRIAL COURT ERRED WHEN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST

INTERESTS OF THE MINOR CHILDREN, AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III.    THE TRIAL COURT ERRED AND FAILED TO PROTECT THE MINOR CHILDREN'S STATUTORY AND DUE PROCESS RIGHTS IN FAILING TO APPOINT AN ATTORNEY FOR THE MINOR CHILDREN.

First and Second Assignments of Error

{¶41} For ease of discussion, we have combined our review of Appellant's first and second assignments of error.

{¶42} In his first two assignments of error, Appellant argues that the trial court's judgment is against the manifest weight of the evidence. More specifically, appellant asserts that the record fails to contain clear and convincing evidence to support the trial court's findings that (1) the children cannot be placed with him within a reasonable time or should not be placed with him and (2) placing the children in the agency's permanent custody is in their best interests.

Standard of Review

{¶43} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re R.M.*, 2013-Ohio-3588, ¶ 53 (4th Dist.). When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' ''weighs the evidence and all reasonable

inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶44} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.*, 2013-Ohio-3588, at ¶ 55 (4th Dist.).

{¶45} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the factfinder, when resolving the

conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.  A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin* at 175; *see Black's Law Dictionary* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

{¶46} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian,* 2004-Ohio-3146, ¶ 7 (4th Dist.).  As the Ohio Supreme Court long ago explained:

> In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record.

*Trickey v. Trickey*, 158 Ohio St. 9, 13 (1952).

Permanent Custody Framework

{¶47} R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the following conditions applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶48} In the case at bar, the agency asserted, and the trial court found, that R.C. 2151.414(B)(1)(a) applies.[2] Appellant argues that clear and convincing evidence does not support the court's R.C. 2151.414(B)(1)(a) finding that the children cannot be placed with him within a reasonable time or should not be placed with him.

{¶49} R.C. 2151.414(E) requires a court that is determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents to consider all relevant evidence. The statute further specifies that if one or more of the following conditions exist "as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:"

> (E) In determining at a hearing held pursuant to division (A) of
> this section or for the purposes of division (A)(4) of section 2151.353
> of the Revised Code whether a child cannot be placed with either parent

---

[2] The trial court stated that the children have not been in the agency's temporary custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). Neither party disputes this finding on appeal.

We note that R.C. 2151.414(B)(1) states that a "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

In the case at bar, on September 8, 2021, the trial court adjudicated the children neglected and dependent. On May 17, 2022, the children were removed from the home. The statute instructs that the earlier date, September 8, 2021, controls. Thus, if the statute means what it says, the children are considered to have entered the agency's "temporary custody" on September 8, 2021, which means that they have been in the agency's "temporary custody," for purposes of R.C. 2151.414(B)(1)(d), for 12 or more months of a consecutive 22-month period. *But see In re Ar.S.*, 2019-Ohio-5378, ¶ 26 (3d Dist.) (stating that a period of protective supervision following an adjudication does not count for purposes of calculating the 12-month period). However, because the parties and the trial court proceeded as if R.C. 2151.414(B)(1)(a) governs, we will consider whether clear and convincing evidence supports the trial court's finding that the children cannot be placed with Appellant within a reasonable time or should not be placed with him.

within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(16) Any other factor the court considers relevant.

{¶50} A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the R.C. 2151.414(E)(1) factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time

or should not be placed with either parent. *See In re C.F.*, 2007-Ohio-1104, ¶ 50; *In re William S.*, 75 Ohio St.3d 95, 99 (1996); *see e.g., In re L.R.B.*, 2020-Ohio-6642, ¶ 52 (2d Dist.); *In re Hurlow*, 1998 WL 655414, *4 (4th Dist. Sept. 21, 1998).

{¶51} In the case before us, competent, clear and convincing evidence supports the trial court's finding that the children cannot be placed with Appellant within a reasonable time or should not be placed with him. The evidence indicates that pursuant to R.C. 2151.414(E)(1), Appellant failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside their home. One of the conditions that caused the children to be placed outside their home was the family's lack of suitable housing. Appellant has not remedied this condition. At the time of the permanent custody hearing, Appellant was living with his paramour in the paramour's mother's house. The agency received reports that multiple individuals were "coming and going from" the paramour's mother's house, "including teenagers living in a shed behind the house."

{¶52} Additionally, due to Appellant's threats, the agency was unable to determine whether his paramour's mother's home would be an appropriate placement for the children. Thus, although Appellant faults the agency for failing to visit this residence, he does not recognize that his threats were the reason why the agency could not visit the residence.

{¶53} The evidence also demonstrates that before Appellant moved in with his paramour, he had not shown a consistent ability to maintain a safe, stable home for the children. The agency caseworker described the family's home at the time of the children's removal as "deplorable."

{¶54} Appellant's failure to secure adequate housing for the children supports a finding, under R.C. 2151.414(E)(1), that he failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside their home. *See In re An.M.*, 2022-Ohio-2873, ¶ 44 (8th Dist.) (upholding trial court's finding that the mother did not substantially remedy the conditions that caused the child's removal when the evidence showed that the mother did not "obtain safe and stable housing"); *In re S.S.*, 2003-Ohio-319, ¶ 15 (2d Dist.) (upholding trial court's finding that the father did not substantially remedy the conditions that caused the child's removal when the evidence showed that the father "did not secure permanent housing, but continued to reside in the homes of various females"); *see also In re B.J.L.*, 2019-Ohio-555, ¶ 76 (4th Dist.) (upholding permanent custody judgment when the evidence showed that the "father ha[d] not maintained stable housing for any significant length of time"); *In re K.J.*, 2008-Ohio-5227, ¶ 22 (4th Dist.) (upholding permanent custody judgment when the parents had "not obtained independent, stable housing"); *In re Barnhart*, 2002-Ohio-6024, ¶ 43 (4th Dist.) ("by not acquiring independent housing," the

father showed that he was "unwilling to provide an adequate permanent home for" the child). *In re Goff*, 2004-Ohio-7235, ¶ 55 (11th Dist.) (upholding permanent custody judgment when "[t]he record clearly demonstrate[d] that, at no time during the[] proceedings, ha[d the parent] been able to provide safe and sanitary housing"). The existence of this one factor alone supports the trial court's finding that the children cannot be placed with Appellant within a reasonable time or should not be placed with him. *E.g., C.F.*, 2007-Ohio-1104, at ¶ 50.

{¶55} Appellant nevertheless argues that his clinician and the children's GAL "suggested that placement with [him] could realistically happen within the following six months." He noted that his clinician stated that Appellant has not returned a positive drug screen since July 2023. This clinician further testified that Appellant's "anger issues had significantly improved" since July 2023. The clinician also indicated that she expected to see Appellant continuing to improve his situation.

{¶56} Appellant asserts that the GAL likewise had faith in his ability to improve his situation. Appellant states that given all of the above, the evidence fails to clearly and convincingly show that the children cannot be placed with him within a reasonable time or should not be placed with him.

{¶57} We do not agree with Appellant. While the evidence may show that Appellant has made some progress, the court emphasized his repeated anger issues

with the agency caseworkers, which hindered his case plan progress. Furthermore, part of the reason that the agency could not verify whether Appellant's current living situation would be appropriate for the children stemmed from Appellant's threats. And even though the agency did not visit this home, the agency received reports that "multiple individuals" had been observed at the property, including teenagers who had been living in a shed. This evidence suggests that this home would not be a safe and stable home environment for the children. Thus, the record does not contain any evidence that Appellant secured housing that would be suitable for the children.

{¶58} In sum, we do not believe that the evidence weighs heavily against a finding that the children cannot be placed with Appellant within a reasonable time or should not be placed with him. The trial court's finding is not, therefore, against the manifest weight of the evidence.

Best Interest

{¶59} Appellant next argues that the trial court's best interest finding is against the manifest weight of the evidence.

{¶60} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents,

siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶61} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 2007-Ohio-1104, ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297, ¶ 19 (10th Dist.). However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶62} In the case at bar, as we explain below, we do not believe that the trial court's best interest determination is against the manifest weight of the evidence. The agency presented substantial clear and convincing evidence that placing the children in its permanent custody would serve the children's best interest.

Children's Interactions and Interrelationships

{¶63} By all accounts, the children and Appellant share a strong bond. The court found that the family is "very close" to each other.

{¶64} The evidence shows that the foster family has provided the children with a suitable home. Since being placed in this home, the children consistently have attended school and have engaged in extracurricular activities. Even if the foster home is not the children's desired placement, the foster family appears to be having a positive effect on the children's lives.

{¶65} We also recognize that "family unity and blood relationship may be 'important factors' to consider, but neither is controlling." *B.J.L.*, 2019-Ohio-555, at ¶ 68 (4th Dist.), citing *In re J.B.*, 2013-Ohio-1703, ¶ 31 (8th Dist.). Indeed, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term . . . and their best interest is the pivotal factor in permanency case." *In re T.S.*, 2009-Ohio-5496, ¶ 35 (8th Dist.). Thus, while biological relationships may be important considerations, they are not controlling when ascertaining a child's best interest. *In re J.B.*, 2013-Ohio-1706, ¶ 163 (8th

Dist.); *accord In re J.F.*, 2018-Ohio-96, ¶ 65 (8th Dist.) (stating that the "existence of a positive relationship," by itself, is not determinative of the child's best interest); *In re S.S.-1*, 2018-Ohio-1349, ¶ 76 (4th Dist.).

## Children's Wishes

{¶66} The children would like to be reunified with Appellant. The GAL did not recommend that the court reunify the children with Appellant, but she did suggest that the court give Appellant more time to demonstrate that he could provide the children with an adequate home. *See C.F.*, 2007-Ohio-1104, at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as child directly expresses or through the GAL).

## Custodial History

{¶67} The children lived with both parents until their May 2022 removal. Before their removal, the agency had protective supervision of the children for around eight months. When the agency filed its May 2023 permanent custody motions, the agency had been involved with the family for approximately two years.

Legally Secure Permanent Placement

{¶68} "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); *Black's Law Dictionary* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary

or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶69} Here, the record indicates that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency temporary custody. As the trial court found, Appellant has a history of being unable to maintain a safe, stable, and sanitary environment for the children. At the time of the permanent custody hearing, he was living with his paramour in the paramour's mother's house. The agency had received reports of multiple people living on the property. Additionally, partly due to Appellant's threats to agency caseworkers, the agency was unable to visit this home. Furthermore, Appellant had not taken other steps to ensure that he would be able to provide the children with a legally secure permanent placement.

{¶70} Appellant nevertheless asserts that the agency could have sought two six-month temporary custody extensions and that the children, therefore, did not need a legally secure permanent placement.

{¶71} We observe that R.C. 2151.415(A)(6) allows an agency to request an extension of temporary custody, unless "a motion for permanent custody described

in division (D)(1) of section 2151.413 of the Revised Code is required to be

made." R.C. 2151.413(D)(1) provides as follows:

> Except as provided in division (D)(3) of this section, if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child. . . . The motion shall be filed in the court that issued the current order of temporary custody. For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶72} If a child is "considered to have entered the temporary custody of an

agency on the earlier of the date the child is adjudicated pursuant to [R.C.] 2151.28

. . . or the date that is sixty days after the removal of the child from home," *id.*, then

the children in the case at bar statutorily have been in the agency's "temporary

custody" for 12 or more months of a consecutive 22-month period. The court

adjudicated the children neglected and dependent on September 8, 2021. On May

17, 2022, the children were removed from the home. Sixty days after their

removal would have been in July 2022. The statute instructs that the earlier date,

September 8, 2021, controls. Thus, unless an exception applied,[3] R.C.

---

[3] R.C. 2151.413(D)(3) lists exceptions to the requirement that an agency file a permanent custody motion and states as follows:

> An agency shall not file a motion for permanent custody under division (D)(1) or (2) of this section if any of the following apply:

2151.415(D)(1) seemingly required the agency to seek permanent custody of the

children in September 2022.

{¶73} Moreover, R.C. 2151.415(D)(4) states as follows:

No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

{¶74} In the case at bar, on June 24, 2021, the agency filed the neglect and

dependency complaints. This date is earlier than May 16, 2022, the date on which

the children were placed into shelter care. Thus, according to R.C.

2151.415(D)(4), the trial court could not have entered an order that continued the

children in the agency's temporary custody beyond June 24, 2023. Consequently,

we disagree with Appellant's argument that the trial court could have granted the

---

(a) The agency documents in the case plan or permanency plan a compelling reason that permanent custody is not in the best interest of the child.

(b) If reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home.

(c) The agency has been granted permanent custody of the child.

(d) The child has been returned home pursuant to court order in accordance with division (A)(3) of section 2151.419 of the Revised Code.

agency two six-month temporary custody extensions and that the children, therefore, did not need a legally secure permanent placement.

{¶75} We also recognize that the evidence indicates that in July 2023, Appellant was starting to make strides to improve his life and well-being and began to engage in some of the case plan activities. As we have observed several times in the past, however, a parent's case plan compliance may be a relevant, but not necessarily a conclusive, factor when a court considers a permanent custody motion. *In re E.R.*, 2023-Ohio-1468, ¶ 45 (4th Dist.); *In re B.P.*, 2021-Ohio-3148, ¶ 57 (4th Dist.); *In re T.J.*, 2016-Ohio-163, ¶ 36 (4th Dist.), citing *In re R.L.*, 2014-Ohio-3117, ¶ 34 (9th Dist.) ("although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"); *In re S.C.*, 2015-Ohio-2280, ¶ 40 (8th Dist.) ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification"); *accord In re K.M.*, 2019-Ohio-4252, ¶ 70 (4th Dist.), citing *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.) ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency"); *In re N.L.*, 2015-Ohio-4165, ¶ 35 (9th Dist.) ("substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"). "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best

interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.' " *W.C.J.* at ¶ 46, quoting *In re Gomer*, 2004-Ohio-1723, ¶ 36 (3d Dist.); *accord In re K.J.*, 2008-Ohio-5227, ¶ 24 (4th Dist.) ("when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan"). Thus, a parent's case plan compliance will not preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest. *Id.* Accordingly, even though Appellant has made some improvements in his life, those improvements do not override the children's best interest.

{¶76} While we do not doubt that Appellant loves his children and desperately wants to reunite with them, his actions regrettably do not show that he will provide the children with the legally secure permanent placement that their best interests demand.

{¶77} This court has recognized that a parent's past history is one of the best predictors of future behavior. *In re West*, 2005-Ohio-2977, ¶ 28 (4th Dist.), citing *In re A.S.*, 2004-Ohio-6323, 2004 WL 2698408, ¶ 37 (12th Dist.) ("Past history is often the best predictor of future conduct. While surely people can change, the facts do not indicate that [the biological parents] have the motivation or ability to follow through and do what is necessary to regain custody of their child."); *In re*

*Vaughn*, 2000 WL 33226177, *7 (4th Dist. Dec. 6, 2000) ("To further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct. Some of the most reliable evidence for the court to consider is the past history of the children and the parents."); *see also In re Brown*, 60 Ohio App.3d 136, 139 (1st Dist.1989) (stating that the mother's "past parenting history and her ability to comply with prior reunification plans regarding her other children were relevant considerations in the juvenile court's dispositional determination" to award a children services agency permanent custody).

{¶78} Here, Appellant's past behavior unfortunately documents that he failed to maintain any stable, consistent, and sanitary environment suitable for the children. While he claims that his paramour's mother's house is a suitable residence, the agency was unable to visit the residence. Furthermore, given that Appellant does not own the residence, the likely permanency of this residence is unknown.

{¶79} Given the children's progress and stabilization while in the agency's temporary custody, the trial court could have quite reasonably decided not to experiment with their welfare by continuing them in custodial limbo to give Appellant more time to demonstrate that he could provide the children with a legally secure permanent placement. We repeatedly have recognized that trial courts need not experiment with a child's welfare:

> "[A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."

*W.C.J.*, 2014-Ohio-5841, at ¶ 48 (4th Dist.), quoting *In re Bishop*, 36 Ohio App.3d 123, 126 (5th Dist.1987).

{¶80} In the case before us, the trial court determined that the children were thriving in the foster home, and it did not have any obligation to experiment with their welfare by providing Appellant additional time to establish a legally secure permanent placement, especially given Appellant's history of failing to maintain an adequate home for the children.  The children need "stability and security . . . to become productive and well-adjusted members of the adult community." *Ridenour*, 61 Ohio St.3d at 324.  Their best interests thus will be "served by placing them in a permanent situation that fosters growth, stability, and security." *C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *Ridenour*.  Consequently, the evidence supports the trial court's finding that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency permanent custody.

Conclusion

{¶81} Based upon all of the foregoing reasons, we cannot say that the evidence weighs heavily against the trial court's judgment granting the agency permanent custody of the children. Accordingly, based upon the foregoing reasons, we overrule Appellant's first and second assignments of error.

Third Assignment of Error

{¶82} In his third assignment of error, Appellant argues that the trial court erred by failing to appoint an attorney to represent the children.

{¶83} We initially observe that Appellant did not request the trial court to appoint independent counsel for the children. Therefore, Appellant failed to preserve the issue for purposes of appeal. *B.J.L.*, 2019-Ohio-555, at ¶ 41 (4th Dist.), citing *In re C.B.*, 2011-Ohio-2899, ¶ 18. We nevertheless may review this assignment of error for plain error. *See Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 27 (stating that reviewing court has discretion to consider forfeited constitutional challenges). As we explain below, we do not believe that the trial court committed an error, plain or otherwise, by failing to appoint—or by failing to inquire whether to appoint—independent counsel for the children.

{¶84} "[A] child who is the subject of a juvenile court proceeding to

terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 2004-Ohio-1500, syllabus, citing R.C. 2151.352, Juv.R. 4(A), and Juv.R. 2(Y). *Williams* does not mandate that a child always have independent counsel in a juvenile court proceeding to terminate parental rights. Instead, a child is entitled to independent counsel in a parental-rights termination proceeding only when "certain circumstances" exist. *Id.*

{¶85} The *Williams* court did not explicitly explain the "certain circumstances" that would warrant the appointment of independent counsel. Instead, the court offered the following guidance for juvenile courts to follow when ascertaining if "certain circumstances" exist: "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the guardian ad litem being appointed to represent the child." *Id.* at ¶ 17. Furthermore, a juvenile court must appoint independent counsel for a child "when a guardian ad litem who is also appointed as the juvenile's attorney recommends a disposition that conflicts with the juvenile's wishes." *Id.* at ¶ 18.

{¶86} Consequently, a trial court ordinarily should appoint independent counsel for a child " 'when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's

recommendations.' " *In re V.L.*, 2016-Ohio-4898, ¶ 39 (12th Dist.), quoting *In re B.K.*, 2011-Ohio-4470, ¶ 19 (12th Dist.); *accord In re Hilyard*, 2006-Ohio-1965, ¶ 36 (4th Dist.).

{¶87} Here, the children's desires and the GAL's recommendations were consistent. The children wished to be reunified with Appellant, and the GAL recommended that the trial court give Appellant more time to work toward reunification. Thus, we do not believe that the trial court plainly erred by failing to appoint counsel to represent the children.

{¶88} Accordingly, based upon the foregoing reasons, we overrule Appellant's third assignment of error.

{¶89} Having overruled all of Appellant's assignments of error, the decision of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J. concur in Judgment and Opinion.


For the Court,


_____
Jason P. Smith
Presiding Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**