[Cite as *In re T.M.*, 2025-Ohio-1977.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No.    25CA5 |
| | : | |
| T.M. date of birth: 04/11/2014 | : | <u>DECISION AND</u> |
| J.M. date of birth: 04/01/2018 | : | <u>JUDGMENT ENTRY</u> |
| | : | |
| Dependent Children. | : | **RELEASED 5/29/2025** |

_____

<u>APPEARANCES</u>:

Steven H. Eckstein, Washington Court House, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, and Molly Bolek, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.

_____

Hess, J.

{¶1}    The mother of T.M. and J.M. appeals a judgment of the Highland County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Highland County Department of Job & Family Services, Child Protective Division (the "Agency").[1]    Mother presents one assignment of error asserting that the grant of permanent custody is against the manifest weight of the evidence.  For the reasons which follow, we overrule the assignment of error and affirm the juvenile court's judgment.

I.  FACTS AND PROCEDURAL HISTORY

{¶2}    On August 10, 2023, the Agency filed a complaint alleging the children appeared to be abused, neglected, and dependent children. The same day, the juvenile court granted the Agency temporary emergency custody. After a hearing, the court continued temporary custody with the Agency. On October 2, 2023, the Agency filed a

---

[1] J.M.'s father is deceased, and the paternity of T.M. was not established.

case plan which required, among other things, that mother complete an alcohol and other drug assessment and follow all treatment recommendations to completion, complete a mental health assessment and follow all treatment recommendations, participate in an approved domestic violence education program, secure and maintain a legal means of income for six months, and secure and maintain safe, stable, and appropriate housing for six months. The same day, the juvenile court conducted an adjudicatory and dispositional hearing. The court found the children were dependent, dismissed the abuse and neglect counts, continued temporary custody with the Agency, and approved the case plan. On July 22, 2024, the Agency moved for permanent custody of the children.

{¶3}   On February 12, 2025, the juvenile court conducted a hearing on the motion.  Mother testified that from April 2017 until July 2018, T.M. was removed from her care, and from February 2020 until April 2021, both children were removed from her care. Since August 10, 2023, they had been in Highland County's custody. Mother did not see them from August 9, 2023, until January 7, 2025.  She testified it was no secret it took her awhile to get going on the case plan. She got a substance abuse assessment and entered treatment at Pickaway Recovery Service in April 2024 but was asked to leave on May 28, 2024.  The next day, she entered treatment at Another Chance Ministries but left on June 20, 2024.  On June 22, 2024, she went to The Counseling Center but left three days later. In August 2024, she was arrested and spent four months in jail in connection with a paraphernalia charge.  She also had a theft conviction and three child endangering convictions.  Mother testified that being in jail "brought me back," and "I just woke up." She had almost six months of "provable sobriety." She had been unemployed for seven years but planned to get a job, get housing, rebuild her life, and take care of her kids.

Since December 11, 2024, she had resided at Stepping Stones. She had two weeks left in the transitional program, and the staff would help her with employment and housing.

{¶4} A visitation monitor at the Highland County Family Advocacy Center testified mother's first visit with the children was January 14, 2025. She attended a total of four weekly visits with them. She missed a visit the Tuesday before the permanent custody hearing because she failed to confirm it by 4:30 p.m. the Friday before as the center requires. Mother called at 7:54 p.m. and said she forgot to call earlier. The children were excited to see mother at visits and appeared to have a good relationship with her. Her interactions with them were appropriate, and the monitor saw no indication she was under the influence.

{¶5} An Agency caseworker testified that on October, 2, 2023, mother tested positive for methamphetamine, amphetamine, and fentanyl. On February 8 and April 16, 2024, she tested positive for methamphetamine and amphetamine. On May 12, 2024, she passed a drug test. Her last failed drug test was on August 29, 2024, when she tested positive for methamphetamine and amphetamine. Mother passed her last drug test, which was on January 30, 2025. The caseworker testified that when the children entered foster care, they "had a lot of behaviors." Those subsided when the children went to their current foster home in February 2024, where they were "doing pretty good." The children were bonded to mother. Once visits started, J.M. started refusing to do schoolwork and having problems at school "but not in the foster home."

{¶6} The guardian ad litem testified that the children wanted to live with mother. If that was not an option, they wanted to live with their grandmother. If that was not an

option, they wanted to live in their foster home. The guardian ad litem recommended a grant of permanent custody to the Agency.

{¶7} An Agency employee who completes home studies testified that before the Agency hired him, it conducted a home study for grandmother. There were concerns about her senior living community, and she was only approved for visits. On December 19, 2024, the Agency received another request for a home study for her. At the time, grandmother was still living in a senior living community and indicated she would be moving, but she could not give a timeframe of when. The employee made three appointments to conduct the home study, but grandmother cancelled for various reasons.

{¶8} The foster mother testified that the children were integrated into her home, and she and her husband were interested in adopting them if the Agency received permanent custody. The children were excited for visits with mother. But after visits started, J.M. had issues at school—J.M. started getting answers wrong on purpose, had temper tantrums, and "had an accident in class." The children's behavior at home did not change except that J.M. was "a little clingier."

{¶9} The juvenile court terminated the mother's parental rights and granted the Agency permanent custody of the children. Citing R.C. 2151.414(B)(1)(b) and 2151.011(C), the court found mother abandoned the children. The court also found it was in their best interest to grant the Agency permanent custody.

## II. ASSIGNMENT OF ERROR

{¶10} Mother presents one assignment of error:

The trial court's grant of permanent custody to the Highland County Jobs and Family Services Children's Division is against the manifest weight of the evidence.

### III.  LAW AND ANALYSIS

### A.  Standard of Review

**{¶11}**  The Supreme Court of Ohio has stated:

When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

### B.  Statutory Framework

**{¶12}**  Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child.  "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} R.C. 2151.414(B)(1)(b) applies when "[t]he child is abandoned." For purposes of R.C. Chapter 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). The juvenile court found the children were abandoned, and mother does not dispute that finding.[2] Therefore, we must affirm the permanent custody award unless the juvenile court erred in its best interest determination.

{¶14} R.C. 2151.414(D)(1) states:

In determining the best interest of a child . . . the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

---

[2] The Agency claims the juvenile court also found applicable R.C. 2151.414(B)(1)(d), which states that "[t]he child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ." But the Agency's motion did not request permanent custody under this provision, the juvenile court did not cite it, and court could not have granted the Agency's motion pursuant to it. "A juvenile court lacks authority to grant an agency's motion on R.C. 2151.414(B)(1)(d) grounds if those grounds were not satisfied when the motion was filed," *In re C.W.*, 2004-Ohio-6411, ¶ 24, and they were not in this case. R.C. 2151.414(B)(1) states that for purposes of that division, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In this case, the earlier date is the date of adjudication, which was October 2, 2023, and the Agency filed its motion for permanent custody on July 22, 2024, less than 12 months later.

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

### C. Mother's Position

{¶15} Mother contends the juvenile court could not reasonably form a firm belief that it was in the children's best interest to grant the Agency permanent custody. Mother maintains that when talking about her drug addiction, the court used words like "unwilling," "choices," "elected," and "selfish," which are "not appropriate when talking about a monkey which all experts agree has complete control over your life." Mother claims "[t]here is no choice or unwillingness involved," it "often takes several attempts to achieve sobriety," and she seems to have achieved that because she was clean for almost six months at the time of the permanent custody hearing. Mother asserts that the children want to return to her and "exhibited poor behavior towards the foster mother" once visitation "restarted," "thereby showing how much they desired [mother's] custody." Mother suggests the court should have continued temporary custody with the Agency to give her more time to finish her drug addiction recovery and work toward reunification.

### D. Best Interest of the Children

#### 1. Interactions and Interrelationships of the Children

{¶16} There is evidence to support the juvenile court's findings that mother had no contact with the children from August 10, 2023, until January 14, 2025, that she visited them four times during the pendency of the case, and that no "apparent problems were observed" during the visits. There is also evidence to support the court's findings that the children had bonded with their foster family and that the foster parents were willing to adopt them. Contrary to what mother claims, there is no evidence that after she started

visiting the children, they exhibited poor behavior towards their foster mother. Rather, there was evidence of behavior problems at school.

## 2. Wishes of the Children

**{¶17}** As the juvenile court found, the children wished to live with mother.

## 3. Custodial History

**{¶18}** T.M. was removed from mother's care from April 2017 until July 2018. Both children were removed from February 2020 until April 2021. As the juvenile court found, the children were in the Agency's custody continuously during this case. At the time of the permanent custody hearing, the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period for purposes of R.C. 2151.414(D)(1)(c). *See* R.C. 2151.414(D)(1) ("a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated . . . or the date that is sixty days after the removal of the child from home").

## 4. Legally Secure Permanent Placement

**{¶19}** Evidence supports the juvenile court's finding that a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency. The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls" and "generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

{¶20} Before this case, T.M. had been removed from mother's care twice, and J.M. had been removed once. Mother did not visit the children for over 500 days during the pendency of this case. Her first visit with them was about a month before the permanent custody hearing. She had a total of four visits with them, and she missed the last available visit because she forgot to confirm it ahead of time. Mother has a history of substance abuse and a criminal history. During this case, she was in and out of treatment facilities and spent four months in jail. At the time of the permanent custody hearing, she was unemployed and did not have housing outside her current treatment facility.

{¶21} Although mother testified that she had been clean for about six months, and there was evidence she was working on her case plan at the time of the permanent custody hearing, "the permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 2019-Ohio-2564, ¶ 34 (4th Dist.). "[K]eeping children in limbo is not in their best interests." *Id.* We have "recognized that a parent's past history is one of the best predictors of future behavior." *In re F.W.*, 2024-Ohio-5431, ¶ 77 (4th Dist.), citing *In re West*, 2005-Ohio-2977, ¶ 28 (4th Dist.). We have also explained that a child

> "'should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"

(Omissions and bracketed text in original.) *Id.* at ¶ 79, quoting *In re W.C.J.*, 2014-Ohio-5841, ¶ 48 (4th Dist.), quoting *In re Bishop*, 36 Ohio App.3d 123, 126 (5th Dist. 1987).

The juvenile court reasonably decided not to experiment with the children's welfare in this instance by continuing to keep them in custodial limbo to give mother more time to demonstrate that she could provide them with a legally secure permanent placement.

### 5. Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶22}** The juvenile court did not cite any factors in R.C. 2151.414(E)(7) to (E)(11). But R.C. 2151.414(E)(10) applies when "[t]he parent has abandoned the child," and the court found mother abandoned the children.

### 6. Conclusion

**{¶23}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the juvenile court's determinations, we conclude that in resolving evidentiary conflicts, the juvenile court did not clearly lose its way or create such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The juvenile court's best interest finding is not against the manifest weight of the evidence. Accordingly, we overrule the sole assignment of error and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
    Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**