[Cite as *In re C.F.*, 2025-Ohio-5015.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | | |
|---|---|---|---|
| In the Matter of: | : | Case No. 25CA4144 | |
| | : | | |
| C.F. (Date of Birth 10/15/2020) | : | <u>DECISION AND</u> | |
| | : | <u>JUDGMENT ENTRY</u> | |
| Adjudicated Dependent Child. | : | | |
| | : | **RELEASED 10/30/2025** | |

_____
APPEARANCES:

Alana Van Gundy, Bellbrook, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and S. Andrew Surgill, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.
_____
Hess, J.

{¶1} The father of C.F. appeals a judgment of the Scioto County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to the Scioto County Children Services (the "Agency").[1] Father presents two assignments of error asserting that (1) the juvenile court erred when it denied his request for a continuance of the permanent custody hearing and (2) the grant of permanent custody to the Agency was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons which follow, we overrule the assignments of error and affirm the juvenile court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶2} On August 2, 2022, C.F. was placed in the emergency custody of the Agency due to the incarceration of both his parents. In a prior 2020 case, C.F. had been

_____
[1] The mother consented to the grant of permanent custody to the Agency.

in the temporary custody of the Agency for a little over a year, from October 19, 2020 (when he was four days old) until October 21, 2021. The juvenile court held an adjudication hearing in September 2022 and a subsequent disposition hearing that same month and found that C.F. was a dependent child and that it was in the best interest of the child to be placed in the temporary custody of the Agency. At progress hearings in February, June, and December 2023, both parents remained incarcerated, and the prior orders remained in effect. In February 2024, the Agency filed a motion for permanent custody under R.C. 2151.413(D)(1) on the grounds that C.F. had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period and that it was in the best interest of the child for permanent custody to be granted.

{¶3}   The juvenile court held a hearing on the motion on May 30, 2024 and February 27, 2025. On the May 2024 hearing date, the juvenile court heard testimony from four witnesses: the court appointed special advocate and guardian ad litem for the child, the foster care parent, an Agency caseworker, and an Ohio Department of Rehabilitations and Corrections case manager for mother.  On the February 2025 hearing date, father orally requested a continuance because he was unable to attend and the juvenile court denied his request. The mother appeared via video and consented to the grant of permanent custody to the Agency. The child's guardian ad litem also testified.

{¶4}   The special advocate and guardian ad litem, Hannah Hanks, testified that in August 2022, C.F.'s father was incarcerated in the Scioto County jail, his mother was incarcerated in prison for felonious assault, and C.F. was living with a person who was manufacturing drugs. C.F. was immediately placed in foster care and has been in that foster home for the entirety of the case. Ms. Hanks testified that C.F. has made extreme

progress in the foster home; he was nonverbal at 22 months of age when he came into the Agency's care but is now very talkative and social in his interactions with others. He exhibits a secure attachment to his foster care family. Ms. Hanks testified that both parents remain incarcerated and not compliant with the case plan. The parents have not secured stable housing for C.F., nor have they any financial means to provide for his needs or safety. Ms. Hanks testified that she believed it was in C.F.'s best interest to be placed in the permanent custody of the Agency and that the foster family was interested in adoption.

{¶5}    An Agency caseworker, Joel Patrick, testified that a former girlfriend of the father was taking care of C.F. while both parents were incarcerated. However, after father was released from jail, he was on his way to pick up C.F. when he was pulled over and arrested for driving a stolen vehicle. The Agency had received a report that the former girlfriend was residing with a person who was manufacturing illegal substances. After talking with the father, who did not want C.F. to continue residing with the former girlfriend under those circumstances, the Agency took C.F. into custody for dependency in August 2022.

{¶6}    Mr. Patrick testified that in February 2023, both parents pleaded guilty to various felony assault charges. Mother was sentenced to a two-to-three-year prison term, and a three-year mandatory prison term for a firearm specification. Her expected release date was August 2027. Father was sentenced to a total 36-month prison term, with an expected release date of March 2025. Mr. Patrick testified that the Agency had previously had temporary custody of C.F. shortly after his birth in October 2020 because at birth C.F. had been exposed to illicit substances. The father gained custody of C.F. in October 2021.

The juvenile court took judicial notice of the prior abuse, neglect, and dependency case involving C.F.  Mr. Patrick testified that C.F. was smart, social, inquisitive, active, and very attached to his foster family, who were interested in adopting him. Mr. Patrick set up video visits between C.F. and mother, but the correctional facility housing father was not cooperative so Mr. Patrick was unable to set up the same visitation with father.

{¶7}    The foster mother testified that she has cared for C.F. since August 2022. She and her husband are licensed foster caregivers. She testified that there is one other child in the home, a one-year-old, and that C.F. enjoys that interaction and bonding. C.F. was shy and reserved when he first arrived at their home but has now developed an outgoing personality. She and her husband would be interested in adopting C.F. if the juvenile court granted permanent custody to the Agency.

{¶8}    Mother's prison case manager testified that she assists mother with visits with C.F. Mother does not have disciplinary problems in the prison and engages in prison programming. Mother's expected release date was August 9, 2027.

{¶9}    The hearing was continued and set for another date on February 27, 2025. Father's counsel made a motion for a continuance due to his absence, which the court denied. Mother testified that she consented to the grant of permanent custody to the Agency. Cortney Brumley, a court appointed special advocate for C.F., testified that it was in C.F.'s best interest to be placed in the permanent custody of the Agency. Ms. Brumley testified about her conversations with father about C.F. Father told Ms. Brumley that he wants to be part of C.F.'s life but that C.F. is probably best off at the foster home. Father had a single facetime visit with C.F. while father was at Alvis House. Father told Ms. Brumley that he could not take immediate custody of C.F. because he was living with

his brother in Columbus, Ohio and it was not an appropriate home. Father had believed he would be released from Alvis House in January 2025 but was not released to an approved house. Ms. Brumley testified that father left Alvis House anyway, had not completed the Alvis House program and "could possibly be AWOL." Father's trial counsel confirmed that father was residing with father's brother in Columbus.

{¶10} The juvenile court granted permanent custody of C.F. to the Agency. The juvenile court found that the child had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period as of the date of the Agency's motion for permanent custody and that it was in the best interest of the child to grant the Agency permanent custody.   The juvenile court reviewed the best interest factors in R.C. 2151.414(D)(1)(a)-(e). In reviewing the interaction and interrelationship of the child with his parents and foster caregiver as set forth in R.C. 2151.414(D)(1)(a), the court found that the parents were able to partly maintain a relationship through the telephonic visitations, but that C.F. has built a strong familial bond with his foster home caregivers, he has thrived there, and they provide for his needs and can provide a permanent home. In reviewing the wishes of the child under R.C. 2151.414(D)(1)(b), the juvenile court found that the three-year-old child was too young to express his wishes, but the court had considered his wishes as expressed through his guardian ad litem and court appointed advocate testimony. Reviewing the custodial history under R.C. 2151.414(D)(1)(c), the juvenile court found that the child had been in the Agency's custody for more than 12 months of the 22-month consecutive period and that he had been in the Agency's custody for over a year in the prior 2020 case. Last, under R.C. 2151.414(D)(1)(d), in considering the child's need for a legally secure permanent placement, the juvenile court found that

mother continues to be incarcerated with time to serve remaining. Although father was released from prison by the date of the February 2025 hearing, the juvenile court found that he failed to present evidence that he can provide for the child. After examining all the relevant factors, the juvenile court found, by clear and convincing evidence, that it is in C.F.'s best interest that permanent custody be granted to the Agency.

**{¶11}** Father appealed.

## II.  ASSIGNMENTS OF ERROR

**{¶12}** Father presents the following assignments of error:

1. The juvenile court erred in finding that permanent custody was in the best interest of the child, when that finding was not supported by sufficient evidence and was against the manifest weight of the evidence.

2. The trial court erred by denying Father's request for a continuance in the permanent custody hearing, thereby depriving him of his fundamental right to be present and participate in the proceedings.

## III.  LAW AND ANALYSIS

**{¶13}** We will address father's second assignment of error first because if we were to sustain it, it would make his first assignment of error moot.

### A.  Request for Continuance

**{¶14}** Father contends that the juvenile court abused its discretion when it denied his request for a continuance of the permanent custody hearing. Father's trial counsel asked for a continuance a few minutes before the hearing began and explained that father was unable to attend because he had moved to Columbus, is living with his brother, and lacked transportation. He argues that, as a result, he was prejudiced because he was unable to appear, present evidence of his own bonding with C.F., and assist his counsel. He contends that the request was reasonable and was made for circumstances beyond

his control. He contends, assuming Ms. Brumley's testimony was accurate, he "lost his chance to place on the record that he wished C.F. to stay in the foster home."

**{¶15}** A trial court has broad discretion to determine whether to grant a continuance. *State v. Conway*, 2006-Ohio-791, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. We reverse a trial court's decision denying a continuance only if the trial court abused its discretion. *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). An abuse of discretion is an "unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady,* 2008-Ohio-4493, ¶ 23.

**{¶16}** An appellate court employs a balancing approach to determine whether the trial court abused its discretion when it denied a continuance. *In re Ca.S.*, 2021-Ohio-3874, ¶ 33 (4th Dist.). In exercising discretion, a trial court should weigh any prejudice suffered by the party seeking the continuance against the court's right to control its docket and provide prompt, efficient justice to the public. *Id*.

> A court should also consider: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique circumstances of the case.

(Citation omitted.) *Id.* The balancing test is applied on a case-by-case basis and the appellant must show how the denial of the continuance resulted in prejudice. *Id*. at ¶ 34. Juv.R. 23 allows for continuances, "only when imperative to secure fair treatment for the parties." *Matter of D.H.*, 2023-Ohio-2368, ¶ 9-13 (4th Dist.).

**{¶17}** We find that the juvenile court's decision to deny father's motion for a continuance was not unreasonable, arbitrary, or unconscionable. A few moments before the start of the hearing, father's trial counsel requested a continuance, explaining that the father had recently moved to Columbus and did not have transportation to get to the hearing in Scioto County. However, there was no argument presented that father did not know well in advance about the hearing date and there was no explanation why, in light of this knowledge, father did not take steps to arrange for transportation well in advance. Father made no representation that he had sudden, unexpected mechanical troubles with a vehicle on the morning of the hearing. Although father argues that he would have presented evidence of his bond with C.F., he does not argue that he had any evidence to present about his current living arrangements or employment, and he does not contend that he would have presented evidence that he could provide a legally secure permanent home for C.F. anytime in the near future – a key factor under the juvenile court's consideration. Additionally, although father was not present, his trial counsel was, and she represented his interest through cross-examination of witnesses and by providing a closing statement advocating father's interests.

**{¶18}** Finally, there had been three prior continuances granted. Following the first hearing date of May 30, 2024, the hearing had been scheduled for a second, third, and fourth hearing date on September 12, 2024, December 5, 2024, and December 19, 2024. These dates were continued until the February 27, 2025 date. A continuance would have inconvenienced the court, the agency, and its witnesses as they were present in the courtroom and prepared to proceed that day. We find that the juvenile court did not err

when it denied father's motion for a continuance. We overrule the second assignment of error.

## B. Permanent Custody Award

**{¶19}** Father contends that the juvenile court erred in granting the Agency permanent custody. Father concedes that the Agency has shown that C.F. was in the Agency's custody for more than 12 out of the 22-months, but he argues that the Agency failed to show that permanent custody to the Agency was in C.F.'s best interest. Specifically, father contends that there was no testimony that he was unwilling or unable to parent C.F.

### 1. Standard of Review

**{¶20}** The Supreme Court of Ohio has stated:

When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

## 2. Statutory Framework: Best Interest of the Child

**{¶21}** Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Because father does not contest the juvenile court's finding under R.C. 2151.414(B)(1)(d) (the temporary custody factor of 12 or more of 22 months), we turn to the best interest factors.

**{¶22}** R.C. 2151.414(D)(1) states:

In determining the best interest of a child . . . the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply
in relation to the parents and child.

### a. Interactions and Interrelationships of the Children

**{¶23}** There is evidence to support the juvenile court's findings that the father's relationship with C.F. has been, at most, "partly maintained" by visitation. The evidence presented at the hearing was that father had no involvement with or custody of C.F. during the first year of his life and thus was either unable or unwilling to parent C.F. during his infancy. When father did obtain custody in October 2021, it was lost nine months later after he placed C.F. in the care of persons manufacturing drugs and was himself further incarcerated and unable to parent C.F. There was also testimony that father had only one visit with C.F. during the entire pendency of the case – a video call while father was at Alvis House. There is also evidence to support the court's findings that C.F. had bonded with his foster family and that the foster parents were willing to adopt him.

### b. Wishes of the Child

**{¶24}** As the juvenile court found, C.F. was too young to express his wishes but the guardian ad litem/special advocate expressed the desire to have C.F. permanently placed with the Agency.

### c. Custodial History

**{¶25}** C.F. was removed from parental care four days after his birth and was in the Agency's temporary custody from then until October 21, 2021, when he was one-year old. Father cared for C.F. for approximately nine months, when it was discovered that C.F. was in the care of persons manufacturing illicit substances. Because father was arrested around that same time and incarcerated, C.F. was removed from his custody

and placed in the temporary care of the Agency and his foster family in August 2022. Father's decision to engage in criminal acts resulted in father's incarceration and his unwillingness or inability to parent C.F. during the entire course of the case.

### d. Legally Secure Permanent Placement

**{¶26}** Evidence supports the juvenile court's finding that a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency. The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls" and "generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶27}** Before this case, C.F. had been removed from his father's care for the first year of C.F.'s life. Because of father's bad decisions, father was incarcerated and unable to parent C.F. during the incarceration. The evidence showed that father was living at Alvis House for a time but was unable to transition to approved housing. Father was residing with his brother in Columbus, but, according to statements he had made to the guardian ad litem and special advocate, father believed his brother's home was not appropriate for C.F. Father does not argue that he had found appropriate housing, steady employment, or otherwise had the ability to provide a legally secure permanent placement for C.F.

**{¶28}** Although father was attempting to find stable housing at the time of the permanent custody hearing, "the permanent custody statutes do not contemplate leaving

children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 2019-Ohio-2564, ¶ 34 (4th Dist.). "[K]eeping children in limbo is not in their best interests." *Id.* We have "recognized that a parent's past history is one of the best predictors of future behavior." *In re F.W.*, 2024-Ohio-5431, ¶ 77 (4th Dist.), citing *In re West*, 2005-Ohio-2977, ¶ 28 (4th Dist.). We have also explained that a child

> "'should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"

(Omissions and bracketed text in original.) *Id.* at ¶ 79, quoting *In re W.C.J.*, 2014-Ohio-5841, ¶ 48 (4th Dist.), quoting *In re Bishop*, 36 Ohio App.3d 123, 126 (5th Dist. 1987). The juvenile court reasonably decided not to experiment with C.F.'s welfare in this instance by continuing to keep him in custodial limbo to give father more time to demonstrate that he could provide C.F. with a legally secure permanent placement.

{¶29} Based on the foregoing, we conclude the juvenile court's best interest finding is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the agency was in the best interest of the child. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence and overrule father's first assignment of error.

IV. CONCLUSION

{¶30} Having overruled the assignments of error, we affirm the juvenile court's judgment.


                                                                    JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
     Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**